**EATON CORPORATION, Plaintiff,**

v.

**MASLYM HOLDING COMPANY and Heinemann Electric (Europe) S.A., Defendants.**

**Civil Action No. 95–5941 (MTB).**

United States District Court, D. New Jersey.

June 28, 1996.

---

Ross & Hardies by George B. Gelman, Somerset, New Jersey, for Plaintiff.

Windels, Marx, Davies & Ives by Amanda F. Schechter, New Brunswick, New Jersey, for Defendants.

## OPINION

BARRY, District Judge.

This matter comes before the court on the motion of defendants Maslym Holding Company ("Maslym") and Heinemann Electric (Europe) S.A. ("Heinemann Europe") for dismissal of the complaint for lack of *in personam* jurisdiction or, in the alternative, on the basis of *forum non conveniens*. The court has reviewed the submissions of the parties without oral argument pursuant to Fed. R.Civ.P. 78.

## I. STATEMENT OF THE CASE

### A. The Parties

Plaintiff Eaton Corporation seeks a declaratory judgment regarding the parties' rights under a Trademark License Agreement ("Trademark Agreement") and a Patent and Know–How Agreement ("Patent Agreement") (collectively, the "Agreements") entered into in December, 1989.

Plaintiff is an Ohio corporation with its principal place of business in Cleveland, Ohio. *Complaint*, ¶ 1. On July 31, 1992, plaintiff purchased the assets of Heinemann Electric Company ("Heinemann Electric"), which was a party to the Patent Agreement. *Id.* at ¶ 43; *Aff. of Olivier Bourgeois* ("Bourgeois Aff."), ¶ 8. At the time the Agreements were executed, Heinemann Electric

had a wholly-owned subsidiary, Heinemann, Inc., which was a party to the Trademark Agreement.[1] *Aff. of James E. Shugars* ("Shugars Aff."), ¶ 2; *Bourgeois Aff.*, ¶ 8.

In 1989, Heinemann Electric was a New Jersey corporation with its principal place of business in Lawrenceville, New Jersey, and Heinemann, Inc. was a Delaware corporation. *Bourgeois Aff.*, ¶¶ 4, 8. By mid–1993, approximately one year after Heinemann Electric was purchased by plaintiff, Heinemann Electric's operations were moved from New Jersey to Salsbury, Maryland. *Id.* at ¶ 17; *Aff. of Amanda F. Shechter*, ¶ 2, 6.

Defendant Heinemann Europe is a corporation established under the laws of Switzerland with its principal place of business in Le Lieu, Switzerland. *Id.* at ¶ 2. It contracted with Heinemann Electric and Heinemann, Inc. under the Agreements. *Aff. of Michael J.E. Frye* ("Frye Aff."), ¶¶ 2–3. In 1989, defendant Maslym purchased all of the shares of defendant Heinemann Europe. *Id.* at ¶ 3. Defendant Maslym is also a Swiss corporation whose principal place of business is in Zug, Switzerland. *Id.*

### B. Defendants' Contacts With New Jersey

Both plaintiff and defendant Heinemann Europe manufacture and sell hydraulic magnetic circuit breakers.[2] Defendant Heinemann Europe manufactures, assembles and distributes the circuit breakers in Europe and Morocco; none of its products is manufactured, sold, or distributed in the United States. *Bourgeois Aff.*, ¶ 3.

Neither defendant Heinemann Europe nor defendant Maslym has an office, bank account, telephone, or telephone listing in New Jersey or anywhere else in the United States. *Frye Aff.*, ¶ 5. Neither owns any real property or has any employees, representatives or agents in New Jersey or anywhere in the United States, nor do they advertise or pay taxes in this country. *Id.* In addition, neither defendant has an agent

---

1. At the time, Heinemann, Inc. owned thirty percent of Heinemann Europe. *Aff. of Michael J.E. Frye*, ¶ 3; *Bourgeois Aff.*, ¶ 9.

2. The circuit breakers sold by defendant Heinemann Europe were originally designed and developed by Heinemann Electric.

for service of process in New Jersey.[3] *Id.* at ¶ 12.

The Agreements which are the subject of this action were executed on December 3, 1987 in Lausanne, Switzerland, and what little negotiation there was did not take place in New Jersey. *Bourgeois Aff.,* ¶¶ 8, 13. The Agreements do not contain choice of forum clauses, but the Patent Agreement designates that it shall be construed in accordance with the laws of the State of Delaware.[4] *Complaint,* Ex. B. at ¶ 15.

The Agreements created long-term commitments between defendant Heinemann Europe, Heinemann Electric, and Heinemann, Inc; they were effective for ten years beginning on January 1, 1988 unless terminated sooner. *Complaint,* Ex. A, ¶ 7; Ex. B, ¶¶ 1, 12. Thus, from 1988 to mid–1993—when Heinemann Electric moved to Maryland—the Agreements were performed by Heinemann Electric and Heinemann, Inc. in New Jersey. This performance included developing technology and sharing it—at defendant Heinemann Europe's request—with defendant Heinemann Europe.

Because the Agreements outlined the terms whereby Heinemann Electric and Heinemann, Inc. shared its trademarks, patents, and know-how with defendant Heinemann Europe, there was considerable written communication generated by all parties to the Agreements. *See Aff. of Steven Burack* ("Burack Aff."), Ex. B; *Aff. of Edward Delaney* ("Delaney Aff."), Ex. B; *Aff. of Ewhen Duma* ("Duma Aff."); *Aff. of James Urie* ("Urie Aff.").[5] Defendants communicated with Heinemann Electric in New Jersey on at least a weekly basis for over three years. *See Burack Aff.,* Ex. B; *Delaney Aff.,* Ex. B; *Duma Aff.; Urie Aff.* Among these communications were requests for know-how and assistance in obtaining UL approvals from Heinemann Electric. *See Urie Aff.,* Exs. C, E, G; *Duma Aff.,* Exs. A, C. One piece of correspondence, a May 15, 1992 letter to Heinemann Electric, asserted that defendant Heinemann Europe had the "exclusive right to sell, manufacture and distribute all products bearing the Heinemann name throughout the continent of Europe." *Complaint,* ¶ 40.

Several representatives of defendant Heinemann Europe travelled to New Jersey on six occasions between January 1990 and April 1992 to discuss matters related to the Agreements. *See Burack Aff.,* Ex. A; *Delaney Aff.,* Ex. A. The subjects discussed included product development and improvement, licensing requests, marketing issues, product costs, and the relationship between defendant Heinemann Europe, Heinemann Electric, and plaintiff. *Burack Aff.,* ¶¶ 5–8; *Delaney Aff.,* ¶¶ 4–6.

Finally, pursuant to the Agreements, Heinemann Europe purchased parts from Heinemann Electric's plant in New Jersey and made royalty payments under the Agreements to Heinemann Electric and Heinemann, Inc. in New Jersey. *Complaint,* ¶¶ 75, 83. Defendant Heinemann Europe has also shipped sample products to Heinemann Electric in New Jersey, but these were sent for the purpose of quality approval; they did not enter the stream of commerce in the United States. *Complaint,* ¶ 76; *Frye Aff.,* ¶ 9.

There is no dispute that defendants' contacts with New Jersey ceased when Heinemann Electric moved from New Jersey to Maryland in 1993.[6] Defendant Heinemann Europe's last contact with New Jersey appears to be a request for technical information on September 23, 1993. *Duma Aff.,* Ex. F, at 1. There has been no contact between defendants and New Jersey for at least the

---

3. Defendant Maslym was served with the complaint by registered mail at its legal mailing address in Zug, Switzerland. *Frye Aff.,* ¶ 12. Defendant Heinemann Europe was served in person with the complaint at its principal place of business in Le Lieu, Switzerland. *Id.*

4. Heinemann, Inc., a party to the Patent Agreement, was incorporated in Delaware at that time. *Bourgeois Aff.,* ¶ 4.

5. The affidavits of Ewhen Duma and James Urie are confidential and are filed with the court under seal.

6. After the move occurred, defendant Heinemann Europe directed the same volume of correspondence to plaintiff in Maryland as it had in New Jersey. *See Add'l Aff. of James Urie; Add'l Aff. of Ewhen Duma.*

last two and a half years. *Bourgeois Aff.*, ¶ 19.

## II. DISCUSSION

A district court sitting in diversity applies the law of the forum state ·in determining whether personal jurisdiction is proper. Fed.R.Civ.P. 4(e); *North Penn Gas Co. v. Corning Natural Gas Corp.*, 897 F.2d 687, 689 (3d Cir.1990). New Jersey's long arm jurisdiction permits· the assertion of *in personam* jurisdiction as far as is constitutionally permissible under the Fourteenth Amendment. *N.J. Court Rule*, 4:4–4; *Apollo Technologies Corp. v. Centrosphere Indus. Corp.*, 805 F.Supp. 1157, 1181 (D.N.J.1992). Thus, the court must look to the limits of due process to determine whether there is personal jurisdiction over the defendants. Personal jurisdiction can be found where there exists general or specific jurisdiction over a defendant or defendants.

### A. *General Jurisdiction*

If a party is subject to the general jurisdiction of a state, he or she can be called to answer any claim against him or her, regardless of whether the subject matter of the cause of action has any connection to the forum. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 9, 104 S.Ct. 1868, 1872 n. 9, 80 L.Ed.2d 404 (1984); *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino,* 960 F.2d 1217, 1221 (3d Cir.1992). To establish general jurisdiction, a plaintiff must demonstrate that the defendant has systematic and continuous contacts with the forum state. *See Helicopteros,* 466 U.S. at 414 & n. 9, 104 S.Ct. at 1872 n. 9 (1984); *International Shoe Co. v. Washington,* 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945).

Plaintiff does not seriously argue that systematic and continuous contacts are present in the case at bar, and the court finds that they are not. Defendants are not incorporated in New Jersey, they maintain no offices here, and they do not· conduct their business in or through New Jersey. *See Helicopteros,* 466 U.S. at 415–16, 104 S.Ct. at 1872–73. The contacts that do exist—namely, correspondence directed to Heinemann Electric and Heinemann, Inc., a few visits by defendants' representatives, and payments made to plaintiff in New Jersey—are not systematic or continuous enough to sustain general jurisdiction over defendants. The court, therefore, must continue to the next inquiry and determine whether specific jurisdiction exists over defendants.

### B. *Specific Jurisdiction*

Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit, the litigation must "arise out of or relate to" the defendant's forum contacts. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985); *Sunbelt Corp. v. Noble, Denton & Assoc., Inc.,* 5 F.3d 28, 32 (3d Cir.1993). In addition, due process requirements are satisfied only where the defendant has " 'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.' " *Helicopteros,* 466 U.S. at 414, 104 S.Ct. at 1872 (quoting *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158). This principle has given rise to a two-prong test: first, the defendant must have had constitutionally sufficient "minimum contacts" with the forum and, second, if minimum contacts are shown, jurisdiction may· be found where the court determines, in its discretion, that to do so would comport with "traditional notions of fair play and substantial justice." *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co.,* 75 F.3d 147, 150–51 (3d Cir.1996).

#### 1. *Minimum Contacts*

Minimum contacts, purposefully established by defendants in the forum state, are the "constitutional touchstone" for determining whether the exercise of personal jurisdiction comports with due process. *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano County,* 480 U.S. 102, 108–09, 107 S.Ct. 1026, 1030, 94 L.Ed.2d 92 (1987); *Burger King,* 471 U.S. at 474, 105 S.Ct. at 2183. Minimum contacts exist if the defendant " 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protec-

tions of its laws.'"[7] *Asahi*, 480 U.S. at 109, 107 S.Ct. at 1030 (quoting *Burger King*, 471 U.S. at 474, 105 S.Ct. at 2183); *North Penn Gas Co. v. Corning Natural Gas Corp.*, 897 F.2d 687, 690 (3d Cir.1990). Stated somewhat differently, defendants' conduct and their connection with New Jersey must be such that they "should reasonably anticipate being haled into court [ ]here." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980); *Vetrotex*, 75 F.3d at 151.

■■■■ In evaluating defendants' contacts with New Jersey, the court first notes that defendant Heinemann Europe entered into the Agreements with Heinemann Electric and Heinemann, Inc., both of whom were located in New Jersey at the time. Although in some contexts, a single contact may be enough to permit a finding of jurisdiction, standing alone, a contract with an out-of-state party does not automatically establish minimum contacts. *Burger King*, 471 U.S. at 478, 105 S.Ct. at 2185; *Sunbelt*, 5 F.3d at 32. Rather, the court must examine "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine whether the defendant purposefully established minimum contacts with the forum. *Burger King*, 471 U.S. at 479, 105 S.Ct. at 2185; *Vetrotex*, 75 F.3d at 151; *Grand Entertainment Group, Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir.1993).

Regarding the "prior negotiations" which led to the Agreements, it is undisputed that the Agreements were executed in Switzerland, and what little negotiation there was did not take place in New Jersey. *Bourgeois Aff.*, ¶¶ 8, 13. Clearly, nothing here supports the exercise of personal jurisdiction over defendants.

■■■ The "future consequences" of the contract along with "the parties' actual course of dealing" tell a somewhat different story, however, and they lead the court to find that minimum contacts are present. First, long-term commitments with state residents contribute to establishing minimum contacts with the forum, as they create "continuing obligations" among the parties. *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184 (citing *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 648, 70 S.Ct. 927, 929–30, 94 L.Ed. 1154 (1950)); *Associated Business Telephone Sys. Corp. v. Greater Capital Corp.*, 861 F.2d 793, 797 (3d Cir.1988). The Agreements created a commitment whereby Heinemann Electric and Heinemann, Inc. would share their trademarks, patents, and know-how with defendant Heinemann Europe over a ten-year period. *Complaint*, Ex. A, ¶ 7; Ex. B, ¶¶ 1, 12. Having established such a relationship, defendants should have anticipated being haled into court here. *Apollo Technologies*, 805 F.Supp. 1157, 1185 (D.N.J.1992).

Moreover, courts have found that communications directed into New Jersey go a long way toward establishing minimum contacts.[8] In *Grand Entertainment*, for example, the Court of Appeals for the Third Circuit held that twelve telephone calls into New Jersey, coupled with negotiations for an agreement that would *have* created rights and obligations among citizens of New Jersey, provided the minimum contacts necessary to satisfy due process. *Grand Entertainment*, 988 F.2d at 482–83. Likewise, in *Carteret Savings Bank, FA v. Shushan*, minimum contacts were established based upon telephone calls and correspondence sent into New Jersey and one meeting in New Jersey. 954 F.2d 141, 147–48 (3d Cir.1992), *cert. de-*

---

7. The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contacts with the forum state. *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1957); *Sunbelt*, 5 F.3d at 32. On the other hand, where the defendant "deliberately" engages in significant activities within a state or creates "continuing obligations" between him or herself and residents of the forum, minimum contacts will be found to exist. *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184 (citations omitted).

8. *See Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184 ("[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines.").

*nied* 506 U.S. 817, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992).[9]

In the case *sub judice,* one or both defendants directed weekly communications—by mail, telefax, and otherwise—into New Jersey over at least a three-year period and, most likely, since the inception of the Agreements. *See Burack Aff.,* Ex. B; *Delaney Aff.,* Ex. B; *Duma Aff.; Urie Aff.* This correspondence included requests for know-how and other inquiries made in furtherance of the Agreements.[10] *See Urie Aff.,* Exs. C, E, G; *Duma Aff.,* Exs. A, C. These communications on a regular basis evidence defendants who "deliberately" engage in significant activities in New Jersey and "purposely avail" themselves of the privilege of conducting activities in this state. *Burger King,* 471 U.S. at 475–76, 105 S.Ct. at 2183–84 (citations omitted).

This conclusion is further supported by the fact that several representatives of defendant Heinemann Europe travelled to New Jersey on six occasions to discuss matters directly related to the Agreements. *See Burack Aff.,* Ex. A; *Delaney Aff.,* Ex. A. In addition, pursuant to the Agreements, Heinemann Europe purchased parts from Heinemann Electric's plant in New Jersey and made royalty payments under the Agreements to Heinemann Electric and Heinemann, Inc. in New Jersey. *Complaint,* ¶¶ 75, 83. The existence of an agreement whereby an entity makes consecutive payments into the forum indicates sufficient minimum contacts for purposes of personal jurisdiction. *North Penn Gas,* 897 F.2d at 690. In sum, the long-term contractual relationship, continuous communications into New Jersey, several visits by defendants' representatives, and payments made into New Jersey are minimum contacts sufficient to permit a finding of personal jurisdiction over defendants.

The inquiry does not end here, however. Even where minimum contacts are present, the strictures of the Due Process Clause forbid the exercise of personal jurisdiction under circumstances that would offend " 'traditional notions of fair play and substantial justice.' " *Asahi,* 480 U.S. at 113–14, 107 S.Ct. at 1033 (quoting *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158).

### 2. *Fair Play and Substantial Justice*

 Once the plaintiff has made out a *prima facie* case of minimum contacts, the defendant must present a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2185; *Grand Entertainment,* 988 F.2d at 483. In determining whether the assertion of jurisdiction violates traditional notions of fair play and substantial justice, the court must consider several factors: the burden on the defendant, the interests of the forum state, plaintiff's interest in obtaining relief, the interstate judicial system's interest in obtaining efficient resolution of controversies, and, if relevant, the shared interest of the several states in furthering substantive social policies. *Asahi,* 480 U.S. at 113, 107 S.Ct. at 1032–33; *Burger King,* 471 U.S. at 476–77, 105 S.Ct. at 2184; *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. at 564–65. The court finds that, on balance, these factors weigh heavily against exercising jurisdiction. *See D'Almeida v. Stork Brabant B.V.,* 71 F.3d 50 (1st Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1570, 134 L.Ed.2d 668 (1996) (even if minimum contacts were present, jurisdiction improper for reasons of fair play and substantial justice).

 In evaluating the burden on defendants, the court is mindful of the Supreme Court's admonition that "[t]he unique bur-

---

9. *See Kultur Internat'l Films, Ltd. v. Covent Garden Pioneer, FSP., Ltd.,* 860 F.Supp. 1055 (D.N.J. 1994) (phone calls, telefaxes and letters sent in connection with negotiations and agreement confer jurisdiction); *Lebel v. Everglades Marina, Inc.,* 115 N.J. 317, 558 A.2d 1252 (N.J.1989) (personal jurisdiction exists where contacts consisted of telephone calls and mailing of sales agreement).

10. Defendants' correspondence is distinguishable from the "informational communications" which the court in *Sunbelt* found to be insufficient to establish personal jurisdiction. *Sunbelt,* 5 F.3d at 32. Whereas in *Sunbelt* the defendant made telephone calls and sent facsimiles to inquire about plaintiff's performance of their contract, here, defendants' requests for know-how and other licensing data were part-and-parcel of the contract: the sharing of information was the essential purpose of the Agreements.

dens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm personal jurisdiction over national borders." *Asahi,* 480 U.S. at 114, 107 S.Ct. at 1033. While defendants have sufficient contacts with New Jersey such that they should have anticipated being haled into court here, they still face substantial obstacles to litigating in this forum. Defendants maintain no presence in New Jersey or, indeed, anywhere in the United States—they do not have an office, bank account, telephone, or telephone listing here. *Frye Aff.,* ¶ 5. Nor do they own any real property or have any employees, representatives or agents in New Jersey or anywhere in the United States. *Id.* Hence, it is not surprising that none of their witnesses and none of their documentary evidence is located in New Jersey; indeed, many of plaintiff's own witnesses are beyond the compulsory process of this court. *Aff. of Andrew D. Crain,* ¶ 2. This being the case, the court finds that the burden on defendants is "severe." *Asahi,* 480 U.S. at 114, 107 S.Ct. at 1033.

Next, the court must consider the interest of New Jersey in adjudicating the dispute. This case is unusual in that the forum's interest in this litigation is minimal to nonexistent. None of the parties is a citizen of New Jersey, and by mid–1993, approximately three years ago, Heinemann Electric and Heinemann, Inc. *moved out* of New Jersey into Maryland, never to return. *Bourgeois Aff.,* ¶¶ 4, 8. Although plaintiff maintains three facilities in New Jersey, they are operated by divisions which have nothing to do with Heinemann Electric, Heinemann, Inc. or any aspect of this action. *Aff. of Earl R. Franklin,* ¶ 3. In short, there is no one left

in this forum who has any interest in this case. Likewise, neither does New Jersey.

Most striking is the utter inefficiency which would result were the interstate judicial system to become involved in adjudicating this controversy. Defendants submit *undisputed* expert testimony [11] that a judgment rendered by a United States court in this action "would not be recognized nor enforceable in Switzerland." *Aff. of Jean–Marc Reymond* ("Reymond Aff."), ¶ 7; *see Reply Aff. of Jean–Marc Reymond* ("Reymond Reply Aff."), at 2.[12] Thus, the court could spend countless hours on an effort that would have little or no meaningful effect on defendants in Switzerland. There simply cannot be a less efficient use of judicial resources.

Of course, the court must also consider plaintiff's interest in obtaining relief in this forum—relief, the court notes, which apparently would be worth nothing. Plaintiff argues that litigating in Switzerland would be exceedingly time-consuming, lasting more than five years, and possibly eight.[13] *Aff. of Christophe Piquet,* at 7. Moreover, plaintiff states that its presentation of evidence would be hampered were it forced to litigate in Switzerland because the Vaud Code of Civil Procedure limits the examination of witnesses residing outside Switzerland to letters rogatory unless the witness agrees to appear. *Id.* at 9; *see Reymond Reply Aff.,* at 5.

While these concerns would weigh heavily in favor of exercising jurisdiction in the typical case, this is anything but the typical case. The unusual confluence of circumstances presented here—a foreign defendant, New Jersey's minimal or nonexistent interest in this matter, and, most importantly, the unenforceability of the court's judgment—make plaintiff's difficulties seem slight in comparison. Notwithstanding plaintiff's litigation concerns,[14] the court will not "spin its

---

11. This testimony is undisputed notwithstanding the fact that plaintiff submitted the expert testimony of Christophe Piguet, a Swiss attorney who is a Doctor of Laws at the University of Lausanne. *See Aff. of Christophe Piguet.*

12. Jean–Marc Reymond is a Doctor of Laws at the University of Lausanne and holds a Master in European Laws from King's College London. *Reymond Aff.,* at 1. He is also an assistant lecturer in civil proceedings at the Law faculty of the University of Lausanne. *Id.*

13. Defendants dispute this conclusion, however, citing data that almost 82% of cases are completed in less than three years. *Reymond Reply Aff.,* at 3.

14. Truth be told, neither plaintiff nor defendants can claim that litigating in a foreign country is an unexpected scenario. The Agreements were entered into by parties on different continents, and the performance of these Agreements was similarly international in scope. Knowing this, the parties elected not to include a choice of

wheels" on a fruitless venture which would only waste the court's—and the parties'—time and effort. The court concludes that it would not comport with "traditional notions of fair play and substantial justice" to exercise jurisdiction in this matter.

### III. CONCLUSION

For the foregoing reasons, the court finds that there is no personal jurisdiction over defendants, and the case is dismissed.

forum clause in either the Trademark or Patent Agreement. Thus, both parties were aware from the outset that should difficulties arise under the Agreements, one of them would be required to litigate in a foreign country.